UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

CAMDEN VICINAGE



JOSHUA JAMES DEVERICKS,

individually and on behalf of all others similarly situated, Plaintiff,

v.

NEW JERSEY TURNPIKE AUTHORITY;
SOUTH JERSEY TRANSPORTATION AUTHORITY;
NEW JERSEY E-ZPASS CUSTOMER SERVICE CENTER;
CONDUENT STATE AND LOCAL SOLUTIONS, INC.;
XEROX CORPORATION; CREDIT COLLECTION SERVICES;
NEW JERSEY GARDEN STATE PARKWAY AUTHORITY;
JOHN DOE CORPORATE POLICYMAKERS 1-10;
JOHN DOE IT SYSTEM ARCHITECTS 1-10;
JOHN DOE COLLECTIONS AGENTS 1-10; and
JOHN DOE TRANSPORTATION SUPERVISORY OFFICIALS 1-10,
Defendants.

Civil Action No. _____

VERIFIED FEDERAL COMPLAINT

Injunctive Relief, Declaratory Relief, Damages,

1

and Reserved Class Allegations

Plaintiff, appearing pro se, alleges as follows

## I. INTRODUCTION

1. This civil action challenges New Jersey's E-ZPass system as an engineered penalty-generation trap built on predatory enrollment, silent account modifications, a one-try debit rule with no overdraft use, and automated fifty-dollar ($50) "administrative" penalties imposed without timely mailed notice, without meaningful pre-deprivation safeguards, and without neutral review.

2. Plaintiff alleges that Defendants designed and maintained a system that converts minor toll issues and short-term account mismatches into avalanche penalties, routinely stacking hundreds or thousands of dollars in $50 fines before a driver ever receives a physical notice or any real chance to cure.

3. A core feature of this trap is predatory enrollment: motorists with small toll issues are steered into E-ZPass membership by promises that prior fines will be "converted" into account credit, without disclosure that membership exposes them to more severe, repeated, and hidden risks than they would face as non-members.

4. Once inside, E-ZPass customers are subjected to a one-try debit rule (even if short by pennies), automatic conversion to "cash-only" status after a single failed attempt, a hidden algorithm that inflates replenishment amounts, continued tag and plate activity, and delayed paper notices that guarantee multiple penalties accrue before anyone can reasonably react.

5. New Jersey's structure is a regional and national outlier. Neighboring states mail modest toll bills with long cure windows and modest late fees. New Jersey instead tacks on immediate $50 penalties, delays mailed notice, and allows dozens of penalties to stack based on a single silent account event.

6. Plaintiff seeks declaratory and injunctive relief, restitution, compensatory damages, statutory damages, punitive damages, and systemic reforms to bring New Jersey's toll enforcement practices into constitutional and consumer-protection compliance.

## II. JURISDICTION AND VENUE

2

7.    This Court has jurisdiction under 28 U.S.C. § 1331 because Plaintiff asserts claims under the United States Constitution and 42 U.S.C. § 1983, and under the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. § 1692 et seq.

8.    This Court has supplemental jurisdiction over Plaintiff's state-law claims, including those under the New Jersey Consumer Fraud Act and unjust enrichment, under 28 U.S.C. § 1367.

9.    Venue is proper in this District under 28 U.S.C. § 1391 because Defendants operate and maintain toll facilities in this District, Plaintiff resides in this District, and a substantial part of the events and omissions giving rise to this action occurred in this District, including in Camden and Atlantic Counties.

III. PARTIES

10.   Plaintiff Joshua James Devericks is a natural person residing at 57 Mount Airy Ave South, Egg Harbor Township, New Jersey 08234. Plaintiff is and was an E-ZPass customer during the events described herein.

11.   Defendant New Jersey Turnpike Authority operates the New Jersey Turnpike and Garden State Parkway and is responsible for toll and penalty policies challenged in this complaint.

12.   Defendant South Jersey Transportation Authority operates the Atlantic City Expressway and participates in the E-ZPass tolling and violation system challenged herein.

13.   Defendant New Jersey E-ZPass Customer Service Center manages E-ZPass accounts, billing, replenishment, violation processing, appeals, and customer communications.

14.   Defendant Conduent State and Local Solutions, Inc., and its predecessor Xerox Corporation, design, implement, host, and maintain E-ZPass hardware and software used for toll reads, automated billing, replenishment attempts, violation generation, and recordkeeping.

15.   Defendant Credit Collection Services (CCS) is a third-party debt collector that attempts to collect alleged E-ZPass violations and penalties from motorists, including Plaintiff.

16.   Defendant New Jersey Garden State Parkway Authority is responsible for policies and operations on the Garden State Parkway and participates in the challenged E-ZPass penalty and collection system.

17.   John Doe Corporate Policymakers 1–10 are unknown individuals who created, approved, or supervised the business rules that produce the penalty-generation trap described herein.

3

18.     John Doe IT System Architects 1–10 are unknown individuals who designed or maintained the algorithms, software, and processes that implement the one-try debit rule, cash-only conversion, replenishment inflation, and automated penalty sequences.

19.     John Doe Collections Agents 1–10 are unknown individuals who forwarded Plaintiff's disputed account to collections and participated in collecting disputed and unvalidated penalties.

20.     John Doe Transportation Supervisory Officials 1–10 are unknown officials responsible for oversight and governance of toll enforcement and collections.

IV. FACTUAL BACKGROUND

A. Predatory Enrollment and the First Avalanche (Mid- to Late-2024)

21.     In or around September 14, 2023, Plaintiff was first steered into E-ZPass after receiving a small cluster of toll issues that likely arose from misreads or minor toll-plaza problems.

22.     When Plaintiff contacted Defendants to resolve these early problems, representatives did not simply bill him at the toll amount or a modest late fee. Instead, they encouraged Plaintiff to enroll in E-ZPass and promised that prior toll balances would be "converted" into account credit if he joined.

23.     At no point did Defendants disclose that E-ZPass membership carries hidden structural risks, including:

a. A one-try debit rule for replenishments, with no second attempt and no use of overdraft protections, even for a difference as small as one cent;

b. Automatic conversion to "cash-only" status after a single failed replenishment attempt;

c. A hidden algorithm that raises replenishment amounts based on prior usage and then keeps those amounts elevated for multiple cycles;

d. Immediate $50 "administrative" penalties for each alleged unpaid toll, often under $1; and

e. Delayed mailed notice, guaranteeing that multiple $50 penalties accrue before a driver can realistically react.

24.     In mid- to late-2024, after Plaintiff had been enrolled and using E-ZPass in good faith, Plaintiff received his first avalanche of E-ZPass violation letters totaling over $1,000 in stacked $50 penalties before any prior mailed notice had warned him that a problem existed.

4

25. Plaintiff spent hours on the phone trying to understand why so many penalties had accumulated. He encountered long hold times, multiple transfers, inconsistent explanations, and at times hostile or dismissive treatment.

26. Eventually, Defendants offered a "one-year courtesy reduction" type of deal: they removed some penalties while insisting that Plaintiff still owed a substantial remainder. This was presented as a one-time grace measure.

27. Plaintiff accepted this limited relief only because Defendants represented that he could still dispute future or remaining penalties and because the alternative was escalating threats of license suspension and collections. The underlying system design remained unchanged.

28. This first avalanche experience established the pattern: the system silently builds penalties, then offers partial forgiveness as a pressure-release mechanism while still extracting large amounts of money.

B. Second Avalanche in 2025 and Strict Timeline

29. Plaintiff continued as an E-ZPass customer into 2025, using New Jersey toll roads regularly and expecting the system to function as advertised.

30. On or about July 19, 2025, E-ZPass attempted a single replenishment debit from Plaintiff's linked bank account. At that time:

a. Plaintiff's E-ZPass account balance was approximately $47.65; and

b. Plaintiff's bank accounts (personal and business, with high cash flow and significant overdraft protection) were capable of covering short-term debits in the hundreds of dollars, including prior same-day cures of overdrafts around $600.

31. Despite this, E-ZPass made only one debit attempt for an amount set by its hidden algorithm. Representatives later confirmed to Plaintiff that, as a matter of policy, they do not attempt multiple draws and will not use or honor overdraft protection—even if the account is short by one cent.

32. After that single failed replenishment attempt on or about July 19, 2025, E-ZPass silently converted Plaintiff's account to "cash-only" status.

33. Critically, even after this conversion, Plaintiff's E-ZPass account balance remained positive for a period. On or about July 21, 2025, when the first alleged unpaid toll later generated a $50 penalty, Plaintiff's E-ZPass account still showed approximately $17.18.

34. The violations at issue in this lawsuit span from:

a. First alleged violation date: July 21, 2025;

5

b. Last violation date in the avalanche: August 10, 2025;

c. Total violations in this cluster: approximately thirty-two (32).

35. A sample violation notice lists a printed "Notice Date" of August 5, 2025. However, Plaintiff did not actually receive the first physical violation envelope in his mailbox until around August 11, 2025.

36. This means that from July 21, 2025 (first alleged violation) until Plaintiff's actual receipt of mailed notice around August 11, 2025, E-ZPass allowed violations to silently accumulate for about three weeks, during which thirty-two separate $50 penalties were created—many while Plaintiff's E-ZPass account balance was still positive.

37. During this period, Plaintiff continued to use toll roads. Some trips were in high-speed E-ZPass lanes, where the transponder no longer protected him because of the silent cash-only conversion. Other trips were in staffed cash lanes, where Plaintiff paid tolls in cash but E-ZPass still registered plate or tag reads in ways that later led to $50 penalties.

38. The result was a second avalanche of penalties in 2025, structurally similar to the mid- to late-2024 avalanche, but now compounded by clear evidence that violations were being generated while the E-ZPass account balance was still positive.

C. One-Try Debit Rule, Overdraft Protection, and Cash-Only Conversion

39. Plaintiff alleges that Defendants deliberately maintain a one-try debit rule that is both undisclosed and unreasonably rigid.

40. E-ZPass does not break replenishments into smaller test amounts, does not retry debits on subsequent days, and does not allow the linked bank's overdraft features to function as designed — even though modern overdraft protections exist specifically to absorb short-term mismatches between withdrawals and deposits.

41. Plaintiff maintains both personal and business bank accounts. His business account, in particular, routinely handles thousands of dollars in monthly flow and has overdraft protection capable of absorbing several hundred dollars of negative balance that can be cured the same day. Plaintiff has previously cured overdrafts of around $600 on the same day they occurred.

42. Despite this, E-ZPass agents informed Plaintiff on recorded calls that:

a. E-ZPass tries only once for a replenishment;

b. They do not re-attempt the debit under their rules; and

c. They do not accept or use overdraft protection, even if the bank would otherwise honor the charge.

6

43. If the debit fails by even one cent, the system treats it as a failed replenishment and automatically converts the account to cash-only.

44. This conversion occurs without any mailed warning, without a grace period, and without any conspicuous notice that continuing to use high-speed E-ZPass lanes will trigger immediate $50 penalties on every trip.

45. Once converted, the system simultaneously:

a. Leaves the transponder and license plate active, so that toll equipment still reads the vehicle;

b. Allows cash-lane payments to be made at staffed booths, where attendants treat the toll as fully paid; yet

c. Still generates $50 penalties as if the toll were unpaid or partially unpaid.

46. This deliberate combination of a one-try rule, no overdraft, silent conversion, and continued tag/plate activity is a key structural element of the penalty trap.

D. Hidden Algorithmic Replenishment Inflation

47. Plaintiff further alleges that E-ZPass uses a hidden algorithm to calculate replenishment amounts based on recent driving history.

48. When a customer drives more frequently in a given period, the algorithm raises the replenishment amount (for example, from $245 to $275), and that higher figure remains in place for multiple billing cycles even when the customer's usage later decreases.

49. E-ZPass does not disclose this algorithm, does not explain the formula, and does not clearly warn that a temporary period of increased driving can lock in elevated replenishment withdrawals.

50. In Plaintiff's case, E-ZPass communications show replenishment thresholds being raised without clear, advance mailed notice. Some emails informed Plaintiff after the fact that a higher amount "has been charged" or "has been applied," even while his account was already placed in cash-only status and violations were accruing.

51. This algorithmic inflation directly increases the likelihood that a single large debit attempt will fail, particularly if timed poorly with other transactions. Once that attempt fails, the one-try rule and cash-only conversion are triggered, and the penalty machine begins.

52. Plaintiff alleges that this hidden billing mechanism is deceptive and unfair, and that it is engineered to magnify the chance of failure and subsequent penalties, not to minimize risk for consumers.

E. Membership More Harmful Than Non-Membership and Lack of Exit

53. As Plaintiff's experience and other motorists' accounts show, being an E-ZPass member is often more dangerous than being a non-member.

54. A non-E-ZPass driver who passes through a toll point typically receives a mailed bill at or near the amount of the toll, sometimes with a small fee, and is given a reasonable window (often sixty to ninety days) to pay before any significant penalty is added.

55. An E-ZPass member, by contrast, is encouraged to use high-speed lanes under the promise of "convenience," but faces a system where:

a. One silent account event (like a single failed debit) can flip the account to cash-only;

b. The plate and tag remain active and keep triggering reads;

c. Each read can generate a $50 penalty; and

d. Mailed notice is delayed until multiple penalties have already been created.

56. Plaintiff's significant other and several other motorists reported the same pattern: they were converted into E-ZPass membership from small toll problems, never warned about the harsher risk structure, and later found themselves facing avalanche penalties.

57. Even when motorists try to exit E-ZPass by removing cards, asking to close accounts, or switching to cash, Defendants keep tags and plates linked, continuing to generate violations if a transponder is still detected or a plate passes a camera.

58. The practical effect is that non-members are safer: they get one bill at the toll amount; while members face a trap, where one administrative problem triggers a cascading penalty structure with no easy exit.

F. Toll Booth Misreads, Receipt Suppression, and Systemic Errors

59. Plaintiff alleges that misreads, false reads, and plaza errors are common and well known among toll attendants.

60. Payment processes at booths require attendants to press a "paid" button or otherwise register a transaction quickly. If an attendant keys it late or incorrectly, the system may still log the vehicle as unpaid.

61. Machines in exact-change or coin lanes frequently jam or malfunction, leading to mismatches between what the driver did and what the system recorded.

8

62. Plaintiff personally experienced situations in which tolls he paid in cash were later treated by E-ZPass as unpaid and turned into $50 penalties. Same-day receipts and records show that he paid tolls on dates when E-ZPass later claimed a violation.

63. Multiple toll-booth attendants independently told Plaintiff that:

a. "Misreads happen a lot."

b. They regularly hear "nightmare stories" from E-ZPass customers whose accounts show violations even when they insist they paid.

c. They have little to no training on how to correct system errors or document misreads in any way that will help the customer later.

64. Attendants also confirmed that, by practice and policy, E-ZPass customers are not automatically given receipts. Even cash-only customers typically receive receipts only if they specifically request them.

65. This receipt suppression has predictable consequences: without receipts or a standardized proof-of-payment system, motorists cannot easily dispute misreads or show that they actually paid a toll when a $50 penalty appears.

66. Combined with lack of training and misread frequency, this practice ensures that when the system is wrong, the driver has no audit trail strong enough to overcome the presumption that E-ZPass data is correct.

G. Silent Account Modifications and Misleading Emails

67. Plaintiff's account history demonstrates that E-ZPass made significant changes to his account—failed replenishment, conversion to cash-only, and increased replenishment thresholds— without sending any timely, clear mailed warnings.

68. After the July 19, 2025 failed replenishment attempt, E-ZPass flipped Plaintiff's account into cash-only status. No letter arrived saying, "Your account is now cash-only; if uncorrected, you will incur $50 penalties for each toll."

69. Instead, Plaintiff later found emails that were confusing and, in context, misleading. These included:

a. A message about being "opted out" of a parking feature (which Plaintiff never used), which did not clearly explain that his core highway toll function had effectively been disabled; and

b. A message stating that his replenishment threshold was raised to $275, written in a way that suggested a normal billing adjustment, not a cash-only failure combined with an avalanche of penalties in progress.

9

70. Plaintiff did not see or understand these emails at the time because:

a. They were buried among spam, including numerous fraudulent E-ZPass-themed scam messages; and

b. The subject lines and content did not clearly disclose that his account status had changed in a way that would generate $50 penalties for each toll.

71. Plaintiff alleges that a fair system would treat account changes such as card removal, replenishment failure, or threshold increase as events requiring mandatory mailed notice. The notice would clearly warn:

a. That the account is now cash-only;

b. That continued use of high-speed lanes will trigger penalties; and

c. That immediate action is required to avoid fines.

72. E-ZPass does not provide such mailed warnings. Instead, it relies on inconsistent emails, then mails violation notices weeks later after penalties have already stacked.

H. Polluted Digital Channels and Failure of Pre-Deprivation Notice

73. E-ZPass-themed phishing scams are widespread. Fraudulent texts and emails mimic official E-ZPass artwork and language to trick motorists into clicking links and paying fake "violations."

74. When customers call E-ZPass and endure long hold times, recorded messages warn them not to trust unsolicited texts or emails demanding payment and instruct them not to click links that could be scams.

75. Federal regulators and consumer-protection agencies similarly warn that unsolicited texts and emails demanding payment are not reliable legal notice channels and that consumers should treat them with suspicion.

76. Despite this, Defendants claim they provide "notice" of failed debits, account changes, and issues through emails and texts—while delaying the only channel that is actually reliable and formally recognized for legal notice: postal mail.

77. Plaintiff alleges that this violates procedural due process. Defendants cannot, on one hand, warn motorists not to trust the very channels used by scammers and, on the other hand, rely on those same channels as "reasonable notice" for penalty-triggering events.

78. Pre-deprivation notice must be reasonably calculated to reach the person before property is taken or penalties accrue. Here, Defendants knowingly rely on polluted channels and slow down mailed notice until after avalanche penalties have already formed.

10

I. Exhaustion of Administrative Remedies, Certified Letters, and Collections During Dispute

79. Plaintiff diligently tried to resolve these issues through E-ZPass's administrative channels.

80. He placed many phone calls, often waiting on hold for one to two hours per call, only to be disconnected, transferred, or spoken to in a hostile manner. Some calls ended with representatives saying there was nothing more they could do.

81. Plaintiff submitted online appeals through the E-ZPass website. These produced generic boilerplate responses that did not address his specific facts, including the positive E-ZPass balances on violation dates and the delayed mailing of notices.

82. Plaintiff sent multiple written appeals by mail, including certified letters with tracking and delivery confirmation. In those letters, he:

a. Explained his timeline and positive balances;

b. Noted the contradictions between his bank statements and E-ZPass's claim of repeated failed debits;

c. Gave reasonable deadlines for a substantive response; and

d. Stated that, if no adequate response was received, he would escalate to higher authorities and potentially file legal action.

83. These letters were either ignored or answered with vague, non-responsive form letters. No meaningful explanation or correction was provided. No substantive investigation was reported back to Plaintiff.

84. While Plaintiff's appeals were still open, Defendants forwarded his account to Credit Collection Services (CCS).

85. CCS then sent multiple collection letters and messages, threatening license suspension, credit consequences, and aggressive collection measures, all while the underlying account remained riddled with unresolved disputes and administrative contradictions.

86. Plaintiff alleges that he fully exhausted all reasonably available administrative remedies. The appeals process functioned as a dead-end, not as a genuine opportunity to be heard, and collections continued during active disputes, compounding the harm.

J. Courtesy Reduction / One-Year Relief Program as Pressure-Release

87. In both the 2024 and 2025 avalanche episodes, Defendants eventually offered Plaintiff a "courtesy reduction" or one-year relief arrangement, where some penalties would be forgiven if Plaintiff agreed to pay a large remainder.

88. This offer only came after Plaintiff:

a. Spent hours on hold and in dispute;

b. Persisted through multiple calls; and

c. Insisted on speaking with higher-level personnel.

89. The structure of this relief is telling:

a. Defendants acknowledge, implicitly, that the penalties are excessive or problematic by agreeing to remove a significant portion;

b. They still demand that the motorist pay hundreds or over a thousand dollars in remaining penalties; and

c. They present it as a "win" for the customer, pressuring acceptance by threatening license suspension or further collections.

90. Plaintiff alleges that this program is not a genuine fairness safeguard but a systemic pressure-release mechanism designed to:

a. Reduce the number of motorists who escalate complaints or file lawsuits;

b. Conceal the depth of the system's structural defects; and

c. Preserve a lucrative penalty-revenue stream while offering partial relief to the most persistent complainers.

91. In Plaintiff's case, "courtesy" reductions did not erase the underlying unlawful design; they simply changed the size of the check Defendants attempted to extract.

K. New Jersey as Interstate Outlier and Revenue Dependence

92. Plaintiff alleges that New Jersey's E-ZPass penalty regime is far harsher than that of neighboring or comparable states.

93. For example, New York and several other E-ZPass-participating jurisdictions typically:

a. Mail initial bills at or near the toll amount;

b. Provide multiple reminder periods before escalating;

c. Apply small, capped late fees rather than immediate large penalties; and

d. Offer long windows (often sixty to ninety days) to cure before serious sanctions.

94. Some states that previously used E-ZPass-style avalanche penalty models have been forced by litigation and public pressure to:

a. Forgive large backlogs of penalties;

b. Impose monthly caps; or

c. Convert penalties into modest administrative fees tied to actual toll usage.

95. New Jersey instead:

a. Imposes immediate $50 penalties per event, often on tolls under $1;

b. Delays mailing physical notices for ten to twenty-one days or more;

c. Allows penalties to stack across dozens of trips before the driver receives a single envelope; and

d. Provides no meaningful cap or proportionality control.

96. Publicly available information and E-ZPass communications confirm that these $50 charges are classified as "administrative fees" used to fund program operations, contractors, and authority budgets—not as direct road repair charges.

97. Plaintiff alleges that New Jersey's penalty structure is thus revenue-dependent: the agencies and contractors rely on penalty income as part of their financial model. This creates a built-in conflict of interest between fair regulation and profit.

98. New Jersey's outlier status, combined with its revenue dependence on penalties, supports Plaintiff's claim that the system is not simply negligent but structurally designed to maximize penalty revenue at the expense of due process and fairness.

L. Systemic Design Defects and Avalanche Penalty Structure

99. Plaintiff integrates all of the above into a unified allegation: New Jersey's E-ZPass system is a systemic design, not a random collection of mistakes, with at least the following features:

a. Revenue dependence: Penalties and "administrative" fees form a significant revenue stream for agencies and vendors.

b. Questionable statutory authority: Add-on "administrative" penalties function more like unlegislated taxes than cost-recovery fees.

c. "Administrative convenience" excuses: Defendants invoke convenience to justify automation and high penalties, even though constitutional rights cannot be sacrificed for convenience.

d. ADA accessibility issues: Long hold times, complex websites, and opaque online processes burden disabled or low-literacy motorists, effectively denying them equal access to disputes and appeals.

e. Machine-driven penalties: Automated systems generate penalties with minimal human review, even when account balances are positive or when cash payments were actually made.

f. Lack of neutral appeals: The same entities that profit from penalties also review appeals, with no independent tribunal or clear standards.

g. No pre-deprivation mailed notice: Penalties are imposed and stack up long before any physical notice is delivered.

h. Polluted communication channels: Defendants rely on texts and emails they themselves warn may be fraudulent and unreliable.

i. Silent account modifications: Card removal, replenishment failures, and cash-only conversions are implemented without mailed warnings.

j. No meaningful exit: Plate and tag remain linked, trapping former members in an ongoing risk zone.

k. Unlawful rulemaking practices: Key penalty and replenishment rules appear to have been implemented by agencies and vendors without transparent, public rulemaking.

l. Penalties operating as taxes: The size and structure of penalties far exceed any reasonable cost of toll collection, functioning as quasi-taxation without proper safeguards.

100.    This architecture reliably produces avalanche penalty events, like those Plaintiff suffered in 2024 and 2025:

a. An initial issue (small toll problem or failed debit);

b. No effective mailed warning;

c. Continued use of toll roads in reasonable reliance on status quo;

d. Silent stacking of $50 penalties; and

e. A final "reveal" in the form of a thick envelope or avalanche of notices.

101.    Plaintiff alleges that this design violates procedural due process, substantive due process, and excessive fines principles, and that it constitutes an unconscionable consumer practice under state law.

V. CAUSES OF ACTION

COUNT I

Violation of Procedural Due Process

42 U.S.C. § 1983 (Fourteenth Amendment)

102. Plaintiff realleges and incorporates by reference paragraphs 1–101 as if fully set forth herein.

103. Defendants, acting under color of state law, deprived Plaintiff of property (money, statutory rights, and related interests) without due process of law.

104. Defendants failed to provide timely, reliable mailed notice of:

a. The failed replenishment attempt;

b. The conversion of Plaintiff's account to cash-only status; and

c. The accrual of dozens of $50 penalties.

105. Defendants instead relied on emails and texts that are known to be polluted by phishing scams and that Defendants themselves warn customers not to trust.

106. Defendants delayed sending physical mailed violation notices until after multiple penalties had accrued, ensuring that Plaintiff's first real opportunity to respond came only after substantial harm had already occurred.

107. Defendants' appeals process—consisting of long hold times, generic online responses, ignored certified letters, and parallel collections—is illusory and not reasonably calculated to provide a meaningful opportunity to be heard.

108. As a direct and proximate result of these practices, Plaintiff suffered significant monetary loss, emotional distress, and ongoing risks to his license, credit, and livelihood.

109. Plaintiff is entitled to compensatory damages, declaratory relief, injunctive relief, and, where appropriate, punitive damages under 42 U.S.C. § 1983.

COUNT II

Substantive Due Process and Excessive Fines

42 U.S.C. § 1983 (Fourteenth Amendment and Eighth Amendment Principles)

15

110. Plaintiff realleges and incorporates by reference paragraphs 1–109 as if fully set forth herein.

111. Defendants imposed $50 penalties on tolls that were often well under $1 and allowed those penalties to accumulate into hundreds or thousands of dollars based on routine commuting and minor administrative issues.

112. Many penalties were imposed while Plaintiff's E-ZPass account balance was positive and while Plaintiff was making good-faith efforts to pay tolls, including paying at staffed cash lanes.

113. The penalties are grossly disproportionate to the underlying conduct, serve mainly as revenue devices rather than regulatory tools, and are imposed through a process that ignores actual fault or intent.

114. The combination of hidden replenishment inflation, one-try debit rule, silent conversion, delayed notice, and avalanche penalties constitutes an arbitrary and oppressive exercise of governmental power that shocks the conscience.

115. Plaintiff is entitled to compensatory and punitive damages, as well as declaratory and injunctive relief, under 42 U.S.C. § 1983 for these substantive due process and excessive fines violations.

COUNT III

New Jersey Consumer Fraud Act

N.J.S.A. 56:8-1 et seq.

116. Plaintiff realleges and incorporates by reference paragraphs 1–115 as if fully set forth herein.

117. Defendants engaged in unconscionable commercial practices, deception, false promises, misrepresentations, and knowing omissions in connection with the sale, promotion, and administration of E-ZPass accounts.

118. These practices include, but are not limited to:

a. Predatory enrollment of motorists into E-ZPass through promises of "crediting" prior fines, without disclosing the greater risks to members;

b. Failure to disclose the one-try debit rule and rejection of overdraft protections;

c. Failure to disclose the hidden replenishment algorithm and its long-term impact on withdrawal amounts;

d. Silent account modifications (cash-only conversion, threshold increases) without mailed warning;

16

e. Reliance on misleading emails about parking and replenishments while penalties are silently accruing;

f. A courtesy reduction program designed to pressure customers into paying large balances while masking systemic defects; and

g. The overall design of a system that converts small, fixable issues into avalanche penalties.

119. Plaintiff suffered ascertainable losses, including but not limited to the value of penalties paid or coerced, time spent, emotional distress, and costs associated with disputing, appealing, and defending against unlawful penalties and collections.

120. Plaintiff seeks treble damages, costs, and any applicable fee shifting under the New Jersey Consumer Fraud Act, in addition to declaratory and injunctive relief.

COUNT IV

Unjust Enrichment

121. Plaintiff realleges and incorporates by reference paragraphs 1–120 as if fully set forth herein.

122. Defendants have been unjustly enriched by retaining funds derived from penalties assessed through a system that is unconstitutional, deceptive, and unconscionable.

123. Equity and good conscience do not permit Defendants to retain such penalty revenue when it was obtained through structural traps, inadequate notice, and defective appeal mechanisms.

124. Plaintiff seeks restitution and disgorgement of all penalty-related revenues obtained from him and, as appropriate, similarly situated motorists.

COUNT V

Fair Debt Collection Practices Act

15 U.S.C. § 1692 et seq.

(Against Credit Collection Services)

125. Plaintiff realleges and incorporates by reference paragraphs 1–124 as if fully set forth herein.

126. Defendant Credit Collection Services is a "debt collector" under the FDCPA and attempted to collect alleged toll-violation debts from Plaintiff.

17

127. CCS sought to collect amounts that included unconstitutional and unconscionable $50 penalties, many of which were imposed while Plaintiff's E-ZPass account was still positive and while disputes were unresolved.

128. CCS continued collection efforts while Plaintiff's account was in active dispute and after Plaintiff had submitted appeals and certified letters, thereby misrepresenting the legal status and amount of the debt.

129. CCS's threats of license suspension and other enforcement actions, without clarifying the disputed and unvalidated nature of the penalty portion, constitute false, deceptive, or misleading representations and unfair or unconscionable means of debt collection.

130. Plaintiff seeks statutory damages, actual damages, and any other relief authorized by the FDCPA, plus costs.

COUNT VI

Declaratory Judgment

131. Plaintiff realleges and incorporates by reference paragraphs 1–130 as if fully set forth herein.

132. An actual, justiciable controversy exists regarding the lawfulness of Defendants' E-ZPass penalty, notice, and collection practices.

133. Plaintiff seeks a declaration that these practices violate procedural due process, substantive due process, excessive fines principles, the New Jersey Consumer Fraud Act, and the FDCPA.

COUNT VII

Injunctive and Equitable Relief

134. Plaintiff realleges and incorporates by reference paragraphs 1–133 as if fully set forth herein.

135. Unless enjoined, Defendants will continue to operate the current penalty-generation system, exposing Plaintiff and similarly situated motorists to ongoing and future unconstitutional harm.

136. Plaintiff seeks preliminary and permanent injunctions requiring Defendants to, at a minimum:

a. Provide clear, timely mailed notice of any failed replenishment attempt, any account conversion to cash-only, and any significant increase in replenishment thresholds;

18

b. Implement a pre-deprivation cure period in which tolls are billed at toll amounts or small fees and penalties are not imposed until the driver has had a fair chance to correct a problem;

c. Modify the debit process to honor overdraft protections or, at minimum, attempt debits in smaller amounts and on more than one occasion before converting accounts to cash-only;

d. Establish reasonable caps and proportionality rules for penalties, especially for short windows of time, such that routine commuting cannot produce thousands of dollars in fines;

e. End receipt suppression and provide automatic receipts or equivalent proof of payment at staffed toll booths;

f. Maintain and disclose transaction-level audit trails for toll payments, misreads, and machine malfunctions;

g. Reform the appeals system to include neutral decision-makers, clear procedures, and a prohibition on forwarding disputed accounts to collections while appeals are pending; and

h. Cease predatory enrollment practices and fully disclose the risks and mechanics of E-ZPass (including the one-try rule and hidden algorithm) before converting toll violations into credits and enrolling motorists.

137.    Plaintiff also seeks any other equitable relief the Court deems just and proper, including but not limited to restitution, disgorgement, and structural reforms.

VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

a. Assume jurisdiction over this action and over the Defendants;

b. Declare that Defendants' E-ZPass penalty, notice, and collection practices are unlawful and unconstitutional as described herein;

c. Enter preliminary and permanent injunctions requiring Defendants to implement the reforms described in Count VII and to cease operating the current penalty-generation system;

d. Award Plaintiff compensatory damages in an amount to be determined at trial;

e. Award treble damages, statutory damages, and fee-shifting relief under the New Jersey Consumer Fraud Act;

f. Award statutory and actual damages against Credit Collection Services under the FDCPA;

g. Award punitive damages against appropriate Defendants under 42 U.S.C. § 1983 to deter future systemic misconduct;

h. Order restitution and disgorgement of penalty-derived funds wrongfully obtained from Plaintiff and, as appropriate, similarly situated motorists;

i. Reserve Plaintiff's right to seek class certification after discovery reveals the full scope of affected motorists, and permit appropriate amendments to assert class claims at that time;

j. Award costs of suit and, if counsel is retained, reasonable attorneys' fees; and

k. Grant such other and further relief as the Court deems just and proper.

VII. JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: December 2, 2025

Egg Harbor Township, New Jersey

Respectfully submitted,

Joshua James Devericks
57 Mount Airy Ave South
Egg Harbor Township, NJ 08234
Plaintiff, Pro Se

VERIFICATION

I, Joshua James Devericks, am the Plaintiff in this action. I have read the foregoing Verified Federal Complaint and know the contents thereof. The facts stated in this Complaint are true to the best of my knowledge, information, and belief.
I declare under penalty of perjury that the foregoing is true and correct.
Dated: December 2, 2025

Joshua James Devericks